STATE OF MAINE                                    SUPERIOR COURT
CUMBERLAND, ss                                    CIVIL ACTION
                                                  DOCKET NO. CV-14-213

STATE OF MAINE
Cumberland, ss, Clerk's Office

DOROTHY SHAFRAN,                    MAR 1 3 2017

        Plaintiff                  RECEIVED

v.                                                JUDGMENT

TAMMY COOK d/b/a
BATH FAMILY DENTAL,

        Defendant

Jury-waived trial on plaintiff's complaint was held over the course of four days, November 18-20, 2015 and December 1, 2016.[1] Both parties appeared and were represented by counsel. Plaintiff alleges a violation of the Maine Human Rights Act (Whistleblower), count I; intentional infliction of emotional distress, count III; negligent infliction of emotional distress, count IV; defamation, count V; and slander per se, count VI.[2] The court has considered the testimony, deposition testimony,[3] exhibits, and arguments of counsel.[4] For the following reasons, judgment is entered in favor of defendant.

PROCEDURAL BACKGROUND

        On the third day of trial, defendant's attorney, Robert Kline, announced he would call no witnesses, in spite of his having told the court and counsel at the close of the second day of trial

---

[1] The unfortunate delay in trying this case resulted from plaintiff's attorneys' efforts to call a representative of the Occupational Safety and Health Administration (OSHA), John Newton, whom counsel subpoenaed. The United States Department of Labor initially objected. The record was left open to allow plaintiffs' counsel to proceed in federal court to secure the testimony. (11/18/15 tr. 53:13-59:12; 11/19/15 tr. 269:4-275:18.) Ultimately, the Department of Labor allowed Mr. Newton to testify. (12/1/16 tr. 13-14.)

[2] Count II was dismissed by order filed November 10, 2014.

[3] Patricia Michaud now lives in Palm Coast, Florida. She was deposed via telephone on October 23, 2015.

[4] Defendant's motion for judgment as a matter of law at the close of plaintiff's case was taken under advisement to permit review of the evidence. That motion is now denied.

1

that he would be prepared to call Michelle Dixon, Melanie Jacques, and defendant as witnesses. (11/19/15 tr. 276-77; 11/20/15 tr. 2.) Instead, he represented to the court his view that he and his client had received unfair and prejudicial treatment throughout the trial. (11/20/15 tr. 2:21-18:1.)

(A) Specifically, he argued first he was left on his own to deal with the following concerns despite his objections. (11/20/15 tr. 5:2-8.) (1) The court did not address adequately his objections regarding plaintiff's counsel's positioning between a witness and Attorney Kline, (2) plaintiff's counsel and witnesses spoke softly, (3) witnesses signaled objections to plaintiff's counsel, and (4) witnesses were argumentative. (11/20/15 tr. 4:12-22.)

(B) Attorney Kline argued second the court was overly solicitous to plaintiff's counsel. (11/20/15 tr. 5:9-7:1.)

(C) Attorney Kline argued third the court's concerns about Courtney Moulton's Fifth Amendment rights interfered with his cross-examination. (11/20/15 tr. 7:2-13:10.)

(D) Attorney Kline argued finally the court's decision to leave the record open to allow plaintiff to present testimony from a witness prejudiced Attorney Kline and his client. (11/20/15 tr. 13:11-17:21.)

The court addresses each of Attorney Kline's arguments.

(A) Positioning, Speaking Softly, Signaling, Argumentative

(1) With regard to Attorney Kline's first argument about plaintiff's counsel positioning, the trial transcripts reflect that plaintiff's counsel adjusted his positioning, apologized, and repeated questions when asked. (See, e.g., 11/18/15 tr. 63:6-8; 64:10-19; 78:17-18; 156:8-12; 11/19/15 tr. 18:7-9; 37:8-10; 49:23-50:2.)

(2) With regard to Attorney Kline's complaint that counsel and witnesses spoke softly, in each instance the question or statement was repeated. (See 11/18/15 tr. 78:17-18; 100:4; 156:8-

2

12; 168:12; 175:6; 181:25; 206:16-19; 11/19/15 tr. 18:7-9; 20:3; 31:6; 37:8-10; 43:16; 49:18; 49:23-50:2; 52:19; 58:18; 86:11-13; 115:4-5; 164:5-6; 198:12; 212:3-4; 214:4-7.)

(3) With regard to the allegation that witnesses were signaling, Attorney Kline once noted that a witness was looking at Attorney Mehnert. (11/19/15 tr. 179:13-25.)

(4) With regard to argumentative witnesses, Attorney Kline stated he believed Chelsea Huntington was being difficult with him. The court disagreed. (11/18/15 tr. 248:20-249:25.) In contrast, defendant testified she could not remember, did not know, or stated "possibly" in response to Attorney Sullivan's questions seventeen times. (11/18/15 tr. 34:21; 35:6-7; 38:15; 41:6; 42:12-15; 51:24; 53:5-7; 60:13-61:7; 72:15; 80:22; 81:1-2; 82:14-17; 85:5; 86:22; 88:18-24; 101:13; 102:7.)

(B) Court Overly Solicitous to Plaintiff's Counsel

Attorney Kline next argued that the court was overly solicitous to plaintiff's counsel. This argument is not supported by the record. (11/18/15 tr. 5:5-6:21; 15:11-15; 55:16-56:3; 58:17-59:12; 76:6-18; 103:1-8; 203:5-6.)

The court is satisfied the following examples noted by Attorney Kline do not show favorable treatment to plaintiff's counsel.

(1) The court agreed to plaintiff's request for a recess at approximately 10:00 a.m. but declined Attorney Kline's request for a recess at 12:10 p.m. The court wanted to complete the examination of plaintiff before the lunch recess, which was taken at 1:11 p.m. (11/19/15 tr. 68:25-69:1; 138:22-139:1; 190:22.)

(2) The court solicited information about plaintiff's counsel's inability to present the testimony of an OSHA witness, who had been subpoenaed. (11/20/15 tr. 6:14-16; 11/18/15 tr. 53:13-59:15; 276:9-277:24; 11/19/15 tr. 274:8-277:12.)

3

(3) Plaintiff's counsel objected to the testimony of Dr. Greg Sarka on relevance grounds. The court responded by asking whether Attorney Kline's examination of Dr. Sarka was relevant. (11/20/15 tr. 6:17-7:1.) Plaintiff's counsel's objection to the testimony was sustained twice. (11/19/15 tr. 264:14-266:14.)

The following instances were not raised by Attorney Kline but show the court was not overly solicitous to plaintiff's counsel.

(1) The court agreed to Attorney Kline's suggested compromise in response to Attorney Sullivan's request that David Cook be sequestered. (11/18/15 tr. 5:5-6:21.)

(2) The court scheduled trial to minimize disruption to defendant's practice. (11/18/15 tr. 15:11-15; 11/20/15 tr. 13:22-14:1; 12/1/16 tr. 309.)

(3) The court told Attorney Sullivan that people may not simply convey to him that a person under subpoena will not be allowed to testify. (11/18/15 tr. 53:13-56:3.)

(4) The court told Attorney Sullivan that it would not be fair to defendant to allow Attorney Sullivan to introduce a document that cannot be cross examined due to the absence of the record's custodian. (11/18/15 tr. 58:17-59:12.)

(5) The court requested that Attorney Sullivan remove extra exhibits in response to Attorney Kline's concerns about duplicates and notes that were not in defendant's handwriting. (11/18/15 tr. 76:6-18.)

(6) The court allowed Attorney Kline to call defendant at a later time and not examine her after Attorney Sullivan's examination. (11/18/15 tr. 103:1-8.)

(7) The court asked Attorney Sullivan to stand when he made objections. (11/18/15 tr. 203:5-6.)

4

(8) During the first two days of trial, the amount of time permitted for each party's examinations of the witnesses was approximately equal: Attorney Kline's examinations totaled 352 minutes; plaintiff's attorneys' examinations totaled approximately 341 minutes.

(9) During the first two days of trial, the court sustained the majority of objections from both Attorney Kline and plaintiff's counsel: 59% (19/32) of Attorney Kline's objections were sustained and 41% (13/32) of his objections were overruled; 75% (30/40) of plaintiff's attorneys' objections were sustained and 25% (10/40) of their objections were overruled. (Attorney Kline's objections were sustained: 11/18/15 tr. 69:22-70:1; 83:24-84:3; 117:13-16; 168:4-23; 172:10-14; 173:16-22; 174:21-175:12; 190:11-18; 193:23-194:2; 194:12-21; 266:23-267:6; 269:16-270:15; 272:18-20; 11/19/15 tr. 29:7-12; 31:10-32:8; 37:14-16; 45:12-14; 61:9-12; 185:2-8. Attorney Kline's objections were overruled: 11/18/15 tr. 152:1-18; 152:25-153:7; 164:6-21; 181:15-21; 192:17-24; 11/19/15 tr. 33:13-16; 43:4-44:4; 68:11-18; 75:8-22; 76:25-77:3; 187:9-17; 252:14-253:14; 254:2-14. Attorney Sullivan's objections were sustained: 11/18/15 tr. 206:1-2; 206:7-9; 223:15-224:12; 229:8-13; 11/19/15 tr. 112:1-5; 195:14-16; 204:23-205:1; 225:1-2. Attorney Sullivan's objections were overruled: 11/18/15 tr. 142:4-144:23; 203:3-13; 220:6-22; 222:20-25; 226:24-227:2; 255:6-23; 11/19/15 tr. 262:16-263:2. Attorney Mehnert's objections were sustained: 11/18/15 tr. 215:12-17; 11/19/15 tr. 91:21-22; 96:10-97:1; 99:9-13; 132:8-14; 135:12-13; 137:25-138:10; 143:11-19; 155:4-156:18; 175:18-176:4; 177:6-178:5; 178:16-179:11; 180:20-25; 231:22-232:2; 235:7-13; 237:11-14; 238:3-6; 240:6-13; 246:22-25; 248:2-5; 249:21-250:6; 267:17-19. Attorney Mehnert's objections were overruled: 11/19/15 tr. 92:14-20; 147:14-23; 163:18-164:4.)

(C) Ms. Moulton's Fifth Amendment Privilege

Attorney Kline argued next that the court's concerns about Ms. Moulton's Fifth Amendment rights interfered with his cross examination of her. He argues that he was not able to pursue the following areas of cross-examination.

(1) Impeachment of Ms. Moulton regarding the day on which she was in touch with defendant. (11/20/15 tr. 8:2-11.)

(2) The impropriety of treating Jeremy Grendell. (11/20/15 tr. 8:14-20.)

(3) The steps Ms. Moulton took to hide Mr. Grendell's treatment from defendant. (11/20/15 tr. 8:21-25.)

(4) The violation of Board of Dental Examiners rules (11/20/15 tr. 9:1-4.)

(5) Ms. Moulton's lack of cooperation with regard to service of process (11/20/15 tr. 9:5-15.)

Attorney Kline cannot claim prejudice on the ground that a witness's Fifth Amendment privilege interfered with his questioning. State v. Brown, 321 A.2d 478, 483 (Me. 1974) ("A party seeking to question a witness may not claim that the court prevented relevant questioning or intimidated witnesses into silence by virtue of the fact that the court advised such witnesses of their constitutional rights.").

Attorney Kline argued that he was distracted by Ms. Moulton's attorney, Attorney Bly, and plaintiff's counsel. (11/20/15 tr. 10:11-21; 11/19/15 tr. 230:16-250:17.) The court offered defendant the opportunity to recall Ms. Moulton when the trial resumed on December 1, 2016, as Attorney Kline had previously suggested. (12/1/16 tr. 4-5; 11/20/15 tr. 16.) The court's offer was declined. (12/1/16 tr. 304.)

6

Attorney Kline argued that his time for examination of Dr. Sarka was shortened by the testimony of Ms. Moulton. (11/20/15 tr. 12:1-18; 11/19/15 tr. 228:22-229:1.) After Dr. Sarka's testimony was completed, the court discussed several matters with counsel and then recessed at 4:01 p.m. (11/19/15 tr. 268:19-277:18.) There was additional time until at least 4:30 p.m. to continue the examination of Dr. Sarka on November 19, 2015. Further, no request to recall Dr. Sarka was made on November 20, 2015 or December 1, 2016.

Attorney Kline was not prepared to "trigger an adverse inference argument." (11/20/15 tr. 12:19-13:10). To the extent Attorney Kline is arguing that the court may have drawn an adverse inference from Ms. Moulton's claim of privilege, no adverse inference exists for nonparty witnesses in civil cases. (11/20/15 tr. 12:19-13:10); see M.R. Evid. 513(c) ("Rule 512 governs a nonparty witness's claim of privilege in a civil action or proceeding."); M.R. Evid. 512(a) ("The fact finder may not draw any inference from the claim of privilege.").

D. Court's Decision to Leave Record Open for Testimony of an OSHA Witness

Attorney Kline argued finally that the court's decision to leave the record open to allow plaintiff to pursue the testimony of an OSHA witness prejudiced defendant because Attorney Kline did not want to call his witnesses until he heard the OSHA representative's testimony (11/20/15 tr. 13:11-15:1; 11/19/15 tr. 269:24-275:18); see M.R. Civ. P. 43(j) ("A party who has rested cannot thereafter introduce further evidence except in rebuttal unless by leave of court.").

Attorney Kline has not shown prejudice as a result of the court's discretionary decision to leave the record open. See Dalphonse v. St. Laurent & Son, Inc., 2007 ME 53, ¶ 16, 922 A.2d 1200 ("The trial court has discretion in determining whether a party may reopen its case after the close of the evidence.") (citation omitted); New England Hotel Realty, Inc. v. Finley, 508 A.2d

7

121, 122 (Me. 1986) ("The consent of the opposing party to a reopening is not necessary in the exercise of discretion by the court.").

On December 1, 2016, when the trial resumed, the court addressed Attorney Kline's requests stated on November 20, 2015. (11/20/15 tr. 15-17; 12/1/16 tr. 3-5.) The requested transcript of day one and day two of trial was provided to counsel. (12/1/16 tr. 3-4.) Attorney Kline was given the opportunity to speak to the OSHA witness, Mr. Newton. (12/1/16 tr. 4, 13-15.) As discussed, the court offered the opportunity to recall Ms. Moulton or submit her deposition testimony. (12/1/16 tr. 4-5.) The court's offer was declined. (12/1/16 tr. 304.) Attorney Kline's request for a mistrial or new trial was denied. (12/1/16 tr. 5.)

FACTS

A. Factual Background

Defendant is a dentist and operates Bath Family Dental. During 2011, in addition to herself, Bath Family Dental employed plaintiff as a dental hygienist, Ms. Huntington as a dental hygienist, Ms. Dixon as a dental assistant and later front desk person, Ms. Michaud as a dental assistant, Ms. Moulton as a dental assistant, and defendant's husband, Mr. Cook, as practice manager and IT person. As front desk person, Ms. Dixon was responsible for billing, although Mr. Cook had performed that task previously. Cathy Turbyne was the Occupational Safety and Health Act (the Act) compliance officer for Bath Family Dental. The dental assistants assisted defendant and the hygienists. Defendant, Mr. Cook, and Ms. Jacques continued to work at Bath Family Dental at the time of trial.

During the 2011 timeframe, defendant worked Monday through Wednesday and was in the office on Thursday to do exams for the hygienists' patients. Other employees worked Monday through Thursday. Bath Family Dental had a benefits policy in effect in 2011. (Def.'s

8

Ex. 5.) Employees were offered health insurance, vacation pay, uniform allowance, and continuing education. Employees at Bath Family Dental had yearly trainings with defendant and Dr. Turbyne.

Plaintiff graduated from Orono High School and attended Bangor Community College. She left college after a semester and worked as a dental assistant. After working for several dentists, she returned to dental hygiene school in Bangor and graduated from the two-year program. She was a clinical instructor at the Bangor dental hygiene school. She worked for a dentist in Belfast and then for another dentist, Dr. Reedy, for sixteen years. She obtained her anesthesia license in 1998. She was a clinical instructor for the local anesthesia program. She also became involved with the Northeast Regional Board of Dental Examiners and was appointed by the Governor as an examiner for eight years.

She relocated to Portland with her second husband and worked for two dentists until she took a leave of absence from dental hygiene for two years. She began work for defendant on July 14, 2008.

Defendant grew up in a dental family because her father was a dentist. She attended the University of Maine for one year and then attended dental hygienist school in North Carolina. She worked full-time as a dental hygienist in North Carolina and South Carolina for sixteen to eighteen years. While working full time, she attended college in North Carolina and received a B.A. in biology with a minor in chemistry. She then attended dental school full time at the University of South Carolina and graduated with a Doctor of Medical Dentistry degree in 2005. She financed her education with loans, the sale of her home, and 401K funds.

She worked with her father in Auburn, Maine and later bought the practice of Dr. Ronald Sawyer in Bath, which became Bath Family Dental. Dr. Sawyer remained a part-time employee

9

and mentor. The facility and equipment were very old and were not compliant with the Act or with the Health Insurance Portability and Accountability Act (HIPAA).

Bath Family Dental closed from September 23 until October 2, 2011 for renovations. The office opened again on Monday, October 3, 2011. The renovations to the office were a source of pride for defendant and resulted in a dramatic improvement in the practice. Employees were given paid vacation during the renovations. The project exceeded the estimated cost of $22,500 by $15,000, which was an unexpected and stressful occurrence for defendant.

Further, during the summer of 2011, money had been stolen from Bath Family Dental accounts attached to payroll. Defendant borrowed money from her mother to meet the practice's payroll obligations. Although defendant had planned to hire a part time hygienist in 2011, she later decided to proceed with three part-time hygienists based on financial issues.

During this 2011 time period, defendant had little energy, was unable to sleep, and reacted differently to stressful situations because of a hormone imbalance. Shortly after the events of fall 2011, defendant was diagnosed with an autoimmune form of hypothyroidism.

Ms. Huntington[5] graduated from University of New England in May 2010 and has a master's degree in dental hygiene. She taught courses in public health, clinical education, radiology, and dental hygiene ethics at the University of New England for one year. She worked at Bath Family Dental from July 19, 2010 until October 2011. She then worked as a temporary, and then full-time, hygienist in Massachusetts for several years. At the time of trial, she was employed full-time as a dental hygienist in Falmouth. She described everyone at Bath Family Dental as very aware of the Act's protocol and procedures for infection control. She rode to

---

[5] Ms. Huntington's testimony's about her emotional distress was admitted de bene. That testimony is not admitted.

10

work at Bath Family Dental with plaintiff and they were good friends. Ms. Huntington described plaintiff as the best hygienist Ms. Huntington ever worked with and a mentor to her.

During the summer of 2011, Ms. Huntington told plaintiff that Ms. Huntington planned to leave Bath Family Dental and move to Boston to be with her boyfriend. At that time, plaintiff had been looking for another job for three years. Ms. Huntington resigned from Bath Family Dental on October 18, 2011. (Pl.'s Ex. 8.)

Ms. Moulton began part-time work at Bath Family Dental in March 2010 as a dental assistant. She began working full-time on June 14, 2010. She was trained by a dental assistant and by defendant. Defendant sent Ms. Moulton to school at defendant's expense. Ms. Moulton had pleaded guilty to a charge of theft on November 21, 2006. The Board learned of that conviction when Ms. Moulton applied for a radiology license, and she wrote a letter of explanation. (Def.'s Ex. 44.) She received the license and as a dental assistant can take x-rays.

Eventually it became clear to those at Bath Family Dental that something was amiss with Ms. Moulton. She spent significant time in the bathroom and took too long to perform her work. She received two verbal warnings on May 14, 2012, for excessive time in the bathroom and for inability to perform work in a timely fashion. (Def.'s Exs. 10-11.)

Ms. Moulton also was convicted of OUI on May 11, 2012. (Def.'s Ex. 7.) Ms. Jacques explained to defendant about Ms. Moulton's OUI and referred defendant to the newspaper article about the incident. (Def.'s Ex. 7.) Defendant was shocked by this news. Defendant and Mr. Cook investigated the incident. (See Def.'s Ex. 7.[6]) On May 17 and 18, 2012, Ms. Moulton's father called Bath Family Dental on behalf of his daughter. On May 19, 2012, Mr. Cook sent a

_____

[6] The exhibit was admitted to show Mr. Cook followed up on information received.

11

text to Ms. Moulton and asked that she contact him. (Def.'s Ex. 12.[7]) She was unable to contact Mr. Cook, however, because she was in a rehabilitation facility. When Ms. Moulton did contact Bath Family Dental, she requested a 30-day leave. Defendant told Ms. Moulton she was not welcome back at the office because of the OUI conviction. Defendant also stated Ms. Moulton would never work in the dental field again. Defendant added that she had learned that Mr. Grendell had been in the office.

Ms. Michaud began working as a dental assistant at Bath Family Dental with Dr. Sawyer, previous owner of Bath Family Dental, in November 2006 and began working for defendant in August 2007. Ms. Michaud worked with plaintiff when she joined the practice in July 2008. At first, Ms. Michaud thought she and plaintiff got along fairly well. During the 2011 time period, Ms. Michaud was diagnosed with breast cancer, had a single mastectomy, underwent radiation and chemotherapy, was preparing for reconstructive surgery, and was wearing a wig.

Ms. Michaud was disciplined because of a complaint by plaintiff involving prophy paste. According to Ms. Michaud, plaintiff called defendant one evening crying and very upset about the incident and asked defendant to fire Ms. Michaud. Instead, defendant discussed the incident with Ms. Michaud, using the Universal Precautions, wrote a warning, and told her to be careful. Ms. Michaud received a written warning about the prophy paste incident and not effectively disinfecting treatment rooms. Ms. Dixon confirmed that defendant addressed the issue with Ms. Michaud. Because of four previous violations, the warning provided Ms. Michaud would be moved permanently to the front desk if the problem was not corrected. (Def.'s Ex. 45.)

---

[7] The exhibit was admitted to show Mr. Cook sent a text to Ms. Moulton on May 19, 2012.

Ms. Michaud was aware of Ms. Moulton's relationship with Mr. Grendell and his interaction with law enforcement. Neither defendant nor Ms. Michaud approved of Mr. Grendell and defendant made clear he was not to be in the office.

Ms. Michaud left her employment at Bath Family Dental in December 2014 on good terms with defendant. Ms. Michaud moved to Florida on December 14, 2014. She described herself as a "good employee." (Michaud Dep. 49.)

Ms. Dixon worked for ten years as a dental assistant and was hired at Bath Family Dental in 2011 as a dental assistant. She assisted defendant, the hygienists, and at the front desk. She left Bath Family Dental in March 2016 and worked at the time of trial as a dental assistant at another practice.

Ms. Dixon described Bath Family Dental as very clean and organized with strict guidelines. It was one of the cleanest practices at which she had worked.

Ms. Dixon described plaintiff as "the Queen Bee" of the office and a bully at times. Ms. Dixon believed that if she did not go along with the way plaintiff and Ms. Huntington wanted things to be, Ms. Dixon would not be around. Ms. Dixon recalled that Ms. Huntington and plaintiff discussed work issues during lunch and were not complimentary about defendant. They were critical of defendant and how the office was run. Sometimes Ms. Dixon did not join the others for lunch because she disliked the negative conversations. Ms. Dixon recalled plaintiff calling defendant, as Ms. Dixon testified, a "F'ing B-I-T-C-H," although plaintiff used the entire words. (12/1/16 tr. 121.) Plaintiff was generally critical of defendant and stated that defendant would have to fire plaintiff before she would leave. Ms. Dixon recalled Ms. Huntington and plaintiff stating that they would bring defendant down. Ms. Huntington denied making that statement.

13

Ms. Dixon received a verbal warning in March 2011 for leaving blood in a treatment room. She was instructed about her error and allowed to redo the work. (Def.'s Ex. 46.)

Ms. Jacques began working at Bath Family Dental on October 24, 2011. She continued to work there at the time of trial.

Dr. Turbyne owns an Act compliant risk management and human resource consulting and training firm. She provides consultation and preventative services to keep dental practices and staff safe. (Def.'s Ex. 47.) She first worked with defendant when she practiced in Auburn, Maine and has worked with defendant since she opened her practice. Dr. Turbyne performed an audit with regard to the Act's requirements in 2007 and an implementation workshop in 2009 at Bath Family Dental. She performed annual workshops attended by all employees and defendant. She encouraged the staff to discuss with defendant any difficulties encountered so they could resolve any issues and decide how to proceed. Dr. Turbyne made many recommendations and they were implemented.

Dr. Turbyne described defendant as very innovative and totally committed to providing the safest environment and infection control workplace for patients and staff. Defendant's goal was consistency and cooperation, an open door policy, and an evidence based program at the practice. Dr. Turbyne believed the practice was very well prepared and provided a channel for employees to come forward if they had a problem. She believed Bath Family Dental was one of the safest practices because of defendant's passion for protection and her compliance.

Dr. Turbyne agreed that appropriate action after a complaint would include defendant's writing up an employee, enforcing procedures with the employee that had not been followed, and informing the complainant of that action. If defendant did not take appropriate action, the employee's complaint to OSHA would constitute appropriate action.

14

B. Concerns of Plaintiff and Ms. Huntington

Plaintiff spoke with defendant several times about infection control issues. Concerns about hepatitis B and C, HIV, and other blood borne pathogens changed the practice of dentistry and universal precautions were adopted by the Center for Disease Control. At Bath Family Dental, training took place every year through continuing education and from the OSHA consultant.

Plaintiff agreed she told OSHA that prior to January 2011, there were no health or safety issues that she noticed or brought to defendant's attention. Plaintiff testified at trial, however, that beginning in 2010, plaintiff spoke to defendant on a couple of different occasions about Ms. Michaud loading a sterilizer with contaminated instruments while not wearing gloves. In response, defendant asked plaintiff to review the issue with Ms. Michaud and train her. Within a month or two, plaintiff witnessed the same conduct on Ms. Michaud's part and reported the concern again to defendant. Defendant asked plaintiff again to address the issue with Ms. Michaud. Plaintiff spoke to defendant again in mid 2011 regarding Ms. Michaud in the sterilization room.

In September 2011, plaintiff spoke to defendant about finding prophy paste with blood on the keyboard in what was supposed to be a clean room. Defendant asked plaintiff to speak to Ms. Michaud. Plaintiff responded that she was not comfortable working with Ms. Michaud any longer because of her infection control process. Plaintiff suggested Ms. Michaud work at the front desk and Ms. Dixon return to the clinical area. Defendant was unwilling to make the change and asked plaintiff again to address the issue with Ms. Michaud. During the conversation, Ms. Michaud became upset and left the room crying. Ms. Michaud received a warning about this incident, which noted four previous warnings had been given. (Def.'s Ex. 45.)

15

In 2011, Ms. Huntington noticed sanitary things that were not being done as she believed they should have been done by the dental assistants. She and plaintiff discussed these concerns. Ms. Huntington informed defendant about Ms. Dixon leaving blood on an instrument in a room where another patient had been seated. This occurred in February 2011, shortly after Ms. Dixon had been hired at Bath Family Dental in January 2011. Ms. Huntington also informed defendant about Ms. Michaud's not wearing gloves and cleaning a denture with an instrument that was only to be used on dirty instruments just before the office closed for renovations from September 23 until October 3, 2011. Ms. Huntington stated there were additional issues with Ms. Michaud that Ms. Huntington did not report to defendant.

Defendant told Ms. Huntington to address the issue herself with Ms. Dixon, which was done and Ms. Dixon realized she must do a better job. Ms. Huntington discussed several issues directly with Ms. Michaud, as did plaintiff. According to Ms. Huntington, Ms. Michaud made it clear she would not change and was not concerned about how she practiced.

Only these few incidents were reported to defendant. The trigger for plaintiff and Ms. Huntington's decision to file the OSHA complaints was Ms. Michaud's activities and infection control in the office. Ms. Huntington denied that plaintiff wanted Ms. Michaud terminated. Ms. Huntington recalled that she and plaintiff wanted Ms. Michaud to work in the front of the office and not in the clinical area. Defendant recalled that plaintiff did not want to work further with Ms. Michaud and that plaintiff wanted Ms. Michaud moved to the front desk or fired. Defendant did not consider firing Ms. Michaud because of her circumstances and because she was a good employee who made a mistake, was written up, and was counseled.

16

Defendant discussed the issues with Ms. Michaud and Ms. Dixon, wrote them up on the issues, counseled them, showed them how to do the matter correctly, and asked a hygienist to address the matter with them. (See Def.'s Ex. 45.)

C. Complaints to OSHA by Plaintiff and Ms. Huntington

Plaintiff and Ms. Huntington discussed "everything" with one another, including incidents at work. (11/19/15 tr. 113.) Ms. Huntington decided to contact OSHA with her anonymous complaint via email to the website on Saturday or Sunday, October 1 or 2, 2011. She had had no contact with OSHA prior to submitting this complaint. She testified she had a huge list with approximately twenty things on the list, an entire page long. (11/18/15 tr. 227-28.) One of her complaints included the lack of a chemical hazard communication program, including MSDS sheets. She never discussed this issue with defendant or Mr. Cook. Ms. Huntington never spoke to Dr. Turbyne about these complaints. On October 3, 2011, Ms. Huntington also sent an email to OSHA representative Mr. Newton with concerns. She complained about defendant not wearing safety glasses but Ms. Huntington did not include the fact that plaintiff did not wear glasses with side shields, which Ms. Huntington did not understand was required at the time of her complaint.

Mr. Newton contacted Ms. Huntington the following day. She knew OSHA would perform an inspection but did not know when.

Plaintiff spoke to a dentist for whom she had previously worked. She learned she could not complain anonymously to the Board of Dental Examiners (the Board). She filed a complaint with OSHA because the complaint could be filed anonymously with that agency. Plaintiff handed the complaint to the OSHA inspectors during their visit on October 4, 2011; she had intended to mail the complaint that day. Although plaintiff testified at trial that she and Ms.

17

Huntington did not discuss the timing of the filing of their complaints, plaintiff told OSHA that she and Ms. Huntington decided it would look better if they did not send both complaints on the same day. Plaintiff and Ms. Huntington were surprised OSHA arrived for the inspection so quickly after Ms. Huntington's complaint.

D. OSHA Inspection

OSHA compliance officer Mr. Newton and his supervisor, Karen Billups, arrived at Bath Family Dental at approximately 11:00 a.m. on October 4, 2011 for an unannounced inspection regarding a complaint about blood borne pathogens. Standard procedure involves the inspectors entering every room at the office. A request is made upon arrival to speak to a representative of management.

At the time, defendant was working on a patient. Mr. Cook was at his desk. Ms. Dixon buzzed him and said OSHA inspectors wanted to speak to him. Defendant called Dr. Turbyne midway through the inspection. Dr. Turbyne spoke to one of the inspectors.

Defendant agreed she was unhappy during the surprise OSHA visit, especially because she was with a patient scheduled for 1.5 hours in treatment room 3. (Def.'s Ex. 30.) She was injecting a patient when she heard pounding on cabinets and loud talking, in spite of her usual effort to control the environment in the office. The patient was rescheduled to return at a later time in a more comfortable environment.

On direct examination, Mr. Newton testified he introduced himself to defendant, gave her a copy of the complaint, and told her they would conduct an inspection of the facility. On cross-examination, he stated he could not remember if he gave the complaint to defendant.

Defendant was upset and could not believe the situation was happening. Based on the nature of the complaints, it appeared to defendant that the complainant was a hygienist. She

18

said she knew who had complained and would fire them. Mr. Newton told her that was not a good idea and would be a violation of the OSHA discrimination law, resulting in a discrimination investigation as well as a health and safety inspection. Defendant then stated she would find another reason and Mr. Newton emphasized again that doing so would be against the law. Mr. Newton was focused on potential retaliation. Ms. Billups also advised defendant that if she fired someone after the inspection, the person would be protected.

Defendant denied that Mr. Newton presented credentials or explained what was occurring. Defendant tried to calm herself. When Mr. Newton began with small talk, defendant told him to get on with it and was, she admitted at trial, snippy with him. He gave her the form with the six complaints made about Bath Family Dental. (Def.'s Ex. 37.)

Defendant was upset because the inspectors were trying to make small talk during a serious matter, which she concluded was unprofessional, and because the complaints were "bogus," in her view. Defendant agreed further that she "said some things that I'm not proud of saying" and was not happy with her behavior. (11/18/15 tr. 51.) She explained she is serious about her job, knew what was going on, and believed the complaint to OSHA was bogus. (Id.) She asked the OSHA inspectors if they realized they were being used and stated the OSHA inspection was "F'ing ridiculous." (12/1/16 tr. 29.)

Defendant has paid the price, as she testified, for her conduct. As discussed below, she settled the Department of Labor case filed against her and pays money to plaintiff every month and will until July 2019. Defendant thought everyone had moved on and believes those at Bath Family Dental have done so.

After the inspection, the inspectors conducted a closing conference during which they summarized the alleged violations. (Def.'s Ex. 37.) Mr. Newton did not tell defendant

19

specifically what violations had been found. Mr. Newton told defendant violations had been found and, again, that it would be unwise to discriminate against employees who participated in the inspection process. As part of his report, Mr. Newton filed a section 11(c) statement pursuant to the Act.[8] In his 30 years experience at OSHA, Mr. Newton had never experienced anyone as belligerent and angry as defendant because of an employee complaint and resulting inspection.

Plaintiff was working on October 4, 2011. During the inspection, she received information from the representatives but was asked no questions. She did not believe her anonymity had been respected. Mr. Newton told her he was concerned there would be retaliation and he wanted her to know she was protected and he gave her contact information. After the inspection, Ms. Huntington sent several emails to Mr. Newton and Bruce Ross, also an OSHA employee, about the events in the office after the inspection. There is nothing on this record to show defendant was aware of these communications, even though the inspection had taken place and a decision was forthcoming.

A few weeks after the inspection, defendant received a citation via mail. (Def.'s Ex. 38.) Except for the hazard communication program, listed as "other" violation, none of the citations was identified in the original complaints and none of the citations was mentioned to defendant by Mr. Newton. (Compare Def.'s Ex. 37 with Def.'s Ex. 38.)

E. The Aftermath of the Inspection

On the day of the inspection, Bath Family Dental employees were told to leave the office for lunch. When Ms. Huntington and plaintiff returned from lunch in the park with the others,

_____

[8] The section 11(c) statement was offered as an exhibit but was not admitted based on defendant's objection. (11/18/15 tr. 58-59; Pl.'s Ex. 5.) Mr. Newton's presence at trial was, therefore, necessary. (12/1/16 tr. 26.)

20

defendant told them she would never trust either of them again. Defendant removed plastic from the rooms, was yelling, and said she would make their lives miserable. Defendant also said she had a nice office and it was time for brand new staff. She cancelled her patients for the day, which was very unusual because of the resulting financial loss. She also put down a pair of safety glasses and told plaintiff to put them on and gave her a warning. One of the alleged violations provided to OSHA was that employees were not wearing safety glasses, which is a requirement listed in the employee handbook. (Def.'s Ex. 37.) The atmosphere at Bath Family Dental was tense and stressful from October 4 until October 18, 2011.

Ms. Michaud believed defendant felt she had been let down by an employee and was upset, tense, and angry. Because of her position as owner and a dentist, however, defendant continued to do her best for her employees. Ms. Michaud concluded plaintiff had "disrespected" defendant, had tried to overpower defendant, and tried to take defendant down in a power play. (Michaud Dep. 30-31.) The two butted heads and "both felt that they were in power" but it was defendant's practice. (Michaud Dep. 46.) Defendant told Ms. Michaud that they had to remain focused on work and "let go of what's all happened." (Michaud Dep. 44.)

Plaintiff called Ms. Michaud and told her she needed to get out of Bath Family Practice and that plaintiff would help with a resume. Ms. Michaud replied, "No. I'm – I'm staying out of all this." (Michaud Dep. 47.) Plaintiff denied that conversation. Ms. Michaud called plaintiff a couple of weeks after she left Bath Family Dental and said she wished "we could still be friends." (11/19/15 tr. 185.)

Plaintiff testified at trial she never called defendant a "fucking bitch" but told the OSHA inspectors she had done that many times during the past three years. Plaintiff testified she had been looking for work outside Bath Family Dental for perhaps a year before September 2011

21

although Ms. Huntington stated plaintiff had been looking for work for three years and plaintiff "could very well have" told the OSHA inspectors she had been looking for work for three years.

F. Warnings

Unsatisfactory work notices or warnings had to be approved by defendant, although they could be prepared by Mr. Cook. Three months after she began work, plaintiff's daughter was treated by defendant. Plaintiff was disciplined and apologized for stepping out of bounds during that treatment. (Def.'s Ex. 1.) In her letter to defendant, plaintiff also thanked defendant for her financial help. (Id.) Plaintiff was also warned in April 2010 for losing her temper and yelling in the office so patients could hear. (Def.'s Ex. 2.) Plaintiff did not have an annual review until mid-2011, when defendant appeared satisfied with plaintiff's work.

After the inspection, defendant issued unsatisfactory work notices to plaintiff on October 4, 2011 for not wearing safety glasses; on October 5, 2011 for improper attachment of x-rays[9]; on October 5, 2011 for yelling at defendant; on October 7, 2011 for failing to provide a medical record; on October 10, 2011 for rescheduling a patient without permission; on October 12, 2011 for not saying hello to an employee during the huddle; on October 18, 2011 for having a beverage in a treatment room; on October 18, 2011 for clocking in before personal activities were completed; and on October 18, 2011 for failing to make post-op calls. (Pl.'s Ex. 7.) Failure to correct the October 12, 2011 violation would result in termination. (Id.)

Ms. Huntington had a one-year review with defendant in July 2011. There were no major negative comments, although there were areas in which she could improve; she was offered a $2.00 per hour raise. Ms. Huntington had no warnings about her performance prior to

_____

[9] Plaintiff told the OSHA inspectors that she did not realize the shots could get mixed up. It was a new x-ray system and there was a learning curve with the system.

22

the OSHA inspection. After the inspection, she was issued unsatisfactory work notices on October 5, 2011 for being disrespectful to defendant; on October 12, 2011 for calling a patient without permission after defendant spoke to Ms. Huntington when the patient called to complain; and on October 12, 2011 for not providing information during examinations of her hygiene patients (Pl.'s Ex. 6.) On the third warning, Ms. Huntington was told she would be released from her job if she did not provide information without being prompted. (Id.)

Three notices were issued to Ms. Huntington on October 18, 2011, one for not calling patients, one for not testing cavitron tips, and one for clocking in early before personal activities were completed. The notices provided that Ms. Huntington was placed on three months probation, would be placed on part time status as of December 8, 2011, and would lose all benefits. The three October 18 notices provided that the consequence of failure to correct the problem was termination of employment. (Id.) Ms. Huntington resigned on October 18, 2011. (Pl.'s Ex. 8.)

After the inspection, defendant and Mr. Cook believed that plaintiff and Ms. Huntington had been advised of their rights by OSHA and thought they could not be fired. As a result, defendant believed they did everything in their power to take control of the office and do whatever they wanted to do. Ms. Michaud described plaintiff as undermining defendant. (Michaud Dep. 41.) On one occasion, plaintiff asked what someone had to do to be fired. On another occasion, she stated she loved her job and could not be fired.

Defendant admitted at trial she had mishandled dealing with staff at the beginning of her ownership of the practice and that plaintiff and Ms. Huntington believed they had power and misused it. When defendant refused to terminate Ms. Michaud as requested, that assertion of

23

power did not sit well with plaintiff and Ms. Huntington. Defendant concluded plaintiff had a bit too much control of the office and did not have the best interests of Bath Family Dental in mind.

On October 18, 2011, Ms. Dixon recalled plaintiff discussed her dissatisfaction with defendant and the office in a derogatory way in the waiting room in front of patients, Ms. Dixon, and a sales representative, Tammy Ann LaRoche. Ms. Dixon reported this conversation to defendant, who decided to terminate plaintiff because of the conversation, which defendant considered to be the last straw. In its October 16, 2012 decision, the Unemployment Insurance Commission found plaintiff participated in an "inadvisable" conversation in the waiting room. (Pl.'s Ex. 15 9.) After plaintiff was terminated, Mr. Cook walked her to the front door and locked the door after she left. A few minutes later, he received a phone call from plaintiff requesting a written termination letter. Plaintiff returned, Mr. Cook typed a letter dated October 18, 2011, and gave it to her that day. (Pl.'s Ex. 9.)

G. Jeremy Grendell Treatment

Mr. Grendell had been the boyfriend of Ms. Moulton since at least 2006. He has criminal convictions in 2006 for theft and unlawful possession of scheduled drugs, in 2010 for theft and forgery, and in 2011 for acquiring drugs by deception.

During July 2010, he suffered a broken jaw in a bar fight. On July 20, 2010, Ms. Moulton was warned about having taken an unscheduled day off because Mr. Grendell needed medical attention related to his broken jaw. (Def.'s Ex. 3.)

On August 10, 2010, Mr. Grendell was treated by Dr. Sarka, an oral surgeon and friend of defendant. While there, Mr. Grendell stole prescription papers, wrote a prescription himself, and presented it to the Bath CVS pharmacy. This conduct resulted in the 2010 convictions for theft and forgery. Because Dr. Sarka was concerned that Ms. Moulton was associated with Mr.

24

Grendell, was present for the criminal incident at Dr. Sarka's office, and was employed at Bath Family Dental, Dr. Sarka relayed the details of Mr. Grendell's conduct to defendant.

Ms. Moulton asked defendant if Mr. Grendell could receive treatment in the office. Defendant replied that he could not because he did not qualify under the office benefits guidelines and because of the incident with Dr. Sarka. Defendant told Ms. Moulton that defendant did not want that type of influence at the office and that if something negative happened, Ms. Moulton could be adversely affected.

A "patient of record" is a patient who has been examined by a dentist and has been provided with a diagnosis or treatment plan by the dentist. (Def.'s Ex. 36.) A person who is not a patient of record may not be seen when the dentist is not present. A dental hygienist may perform a cleaning and the tasks associated with a cleaning on a patient of record when the dentist is not in the office. (Id.)

Typically, a patient is seen first by the front desk person. Their information is entered in the computer to create a patient record. Plaintiff then meets the patient in the waiting room and proceeds with treatment. Defendant would then examine the patient. Plaintiff would note any proposed treatment in the chart and the patient would leave. Billing information was done by the front desk.

Although he was not on the schedule, Mr. Grendell visited Bath Family Dental on June 22, 2011. (See, e.g., Def.'s Ex. 14.) He thought Ms. Moulton had arranged for the visit with defendant, although nothing was discussed between Ms. Moulton and Mr. Grendell. X-rays were taken and his teeth were cleaned. He paid nothing for the services. Ms. Moulton did not speak to defendant about his visiting Bath Family Dental. She agreed at trial that he did not qualify for free treatment under the benefits plan because she and Mr. Grendell were not married

25

and that new patients were not scheduled when defendant was not present. The Bath Family Dental benefits policy made clear only immediate family members, defined as a spouse or child, could receive treatment at Bath Family Dental. (Def.'s Ex. 5.) Benefits, of course, are not required to be provided by the practice. Mr. Grendell was not a patient of record at Bath Family Dental on June 22, 2011.

Ms. Moulton did not add Mr. Grendell to the schedule and did not set him up as a new patient, which was the normal procedure. A history must be taken for a new patient to determine any medical issues and whether premedication is required before the appointment. This was not done before Mr. Grendell's treatment. When Ms. Moulton took x-rays, she did not match the x-rays to Mr. Grendell in the system because he was not in the system. (See, e.g., Def.'s Ex. 14.) X-rays can be deleted unless a chart is opened for a patient.

Ms. Moulton took a full mouth series of x-rays for Mr. Grendell. A review of a report that shows digital image exams taken from June 20 to June 23, 2011 revealed a full mouth series of x-rays on a test-test patient was taken on June 22, 2011. A test-test patient was used for training. (Def.'s Ex. 6.)

Ms. Moulton approached plaintiff about whether she would be willing to clean her boyfriend's teeth because plaintiff had an opening in her schedule. Plaintiff met with him, reviewed his medical history, and determined he was healthy for treatment. Plaintiff performed a periodontal charting, recorded by Ms. Moulton on paper. According to plaintiff's testimony, she was not troubled because she understood Ms. Moulton would transpose the information to a computer chart. (See Pl.'s Ex. 17.) After the cleaning, plaintiff continued to her next patient.

26

Plaintiff maintained she did not know Mr. Grendell was not a patient of record of Bath Family Dental. (Def.'s Ex. 36.) Plaintiff read a paper medical history, as opposed to a history in the computer, the normal procedure for a patient of record at Bath Family Dental.

Emergency patients were referred to the dentist on call if defendant was not at the office. Plaintiff had never performed an initial exam on a person who had only a paper record. Plaintiff used a paper chart for Mr. Grendell, even though paper dental charts were only used at Bath Family Dental for Give Kids a Smile Day, when Bath Family Dental treated children as a public service. Plaintiff denied telling Ms. Dixon that Mr. Grendell was not on the schedule and would not be put on the schedule. She denied printing x-rays for Mr. Grendell or trying to delete his x-rays with Ms. Huntington, contrary to Ms. Michaud's testimony. (Michaud Dep. 17.) Plaintiff had never seen anyone except Mr. Grendell and the Give Kids a Smile patients whose records were not in the computer.

On the computer screen documentation of x-rays taken, a patient's name is listed, unless the patient was listed as a test, in which case the term "test test" was used. (Def.'s Ex. 6.) Once a patient's chart is opened, that patient's x-rays appear on the computer screen. When plaintiff walked into the room where Mr. Grendell was seated, she testified at trial she did not look for a name. She told the Board it never occurred to her to check the computer to see under whose name the x-rays were taken. (Def.'s Ex. 16.)

At Bath Family Dental, when a patient of record was treated while defendant was not in the office, the hygienists and assistants discussed the treatment and x-rays with defendant upon her return by opening the chart in the computer. That was not done in Mr. Grendell's case because, among other reasons, his treatment was not entered in the computer. Although plaintiff told the Board she had "no reason to think that Jeremy wasn't going to return for a new patient

27

exam with Dr. Cook," that procedure was not the practice at Bath Family Dental. (Def.'s Ex. 16 1.) The procedure used for Mr. Grendell was contrary to the process in place at Bath Family dental for years prior to June 22, 2011.

Ms. Huntington was aware Mr. Grendell was at the office on June 22, 2011 and did not think the visit was inappropriate. She knew he had drug problems.

Ms. Michaud believed that Ms. Moulton and plaintiff were involved together in the treatment of Mr. Grendell. Both were together and tried either to delete Mr. Grendell's x-rays or scan them. One or the other stated, "[w]e don't want Dr. Cook to find out." (Michaud Dep. 18.) Ms. Michaud did not report the incident to defendant because Ms. Michaud did not want to get involved. She was "going through some health issues and [she] had to work with these people, and [she] didn't want to have any more stress involved in [her] life at the time. It was hard enough to keep on working and dealing with [her] own situation, so [she] did not tell Dr. Cook." (Michaud Dep. 17-18.)

Ms. Dixon stated that plaintiff said she would see Mr. Grendell, that they would not talk about it, and he would not be put in the schedule. Ms. Dixon stated this procedure was unusual and never done in the office because a paper chart was never used except for Give Kids a Smile patients. Ms. Dixon did not respond to the Grendell situation and decided it was "best not to get into it." (12/1/16 tr. 136.) She felt her life could be made miserable because plaintiff and Ms. Huntington controlled the office and Ms. Dixon had only worked there five months.

At some point between the Grendell visit and May 21, 2012, defendant asked Ms. Dixon about what had happened with Mr. Grendell. Ms. Dixon explained what had occurred, felt extremely bad she had not reported this incident to defendant and apologized. Ms. Jacques also informed defendant about Mr. Grendell's treatment. When Ms. Michaud admonished Ms.

Jacques for relating the Grendell treatment to defendant, Ms. Jacques began crying because she "had been holding so much in for so long." (12/1/16 tr. 178.) In May 2012, defendant confronted Ms. Michaud and asked about the Grendell incident and why Ms. Michaud had not told defendant about it. Defendant was very upset. Ms. Michaud apologized and wrote a letter explaining the incident at defendant's request.

Mr. Cook prepared a memo of events involving Mr. Grendell because defendant and he determined they would need to remember the events. (Def.'s Ex. 13.) Defendant was shocked and devastated to learn what had happened in her office while she was absent.

## H. Other Litigation

### 1. Plaintiff's Unemployment Compensation Application

After leaving Bath Family Dental, plaintiff applied for unemployment. After a phone conference between plaintiff and a deputy, plaintiff received unemployment compensation benefits. Defendant opposed the application and argued plaintiff's termination was based on misconduct. The Administrative Hearing Officer determined plaintiff had been terminated for misconduct. (Def.'s Ex. 20.) Plaintiff appealed that decision. (Def.'s Ex. 40.) After a two-day hearing, the Unemployment Insurance Commission overturned the hearing officer's decision by a two to one vote by decision dated October 16, 2012. (Pl.'s Ex. 15.) Defendant appeared at the second day of the hearing but did not testify. Defendant appealed that decision pursuant to Rule 80C. M.R. Civ. P. 80C; (Def.'s Ex. 39.)

### 2. Defendant's Board of Dental Examiners Complaint

Defendant took time to think about the Grendell incident after she learned about it on May 21, 2012. She was concerned that Mr. Grendell could have stolen her prescription pads, as he had from Dr. Sarka's office. She did not know whether Mr. Grendell was on drugs at the

29

office and did not believe plaintiff knew he was a drug addict. She continued to worry about the significant implications to Bath Family Dental and to patient safety and the event continued "to eat at" her. She had never seen anything like this incident at any office she ever worked in. Defendant believed plaintiff put the practice in jeopardy by treating a drug addict, stole from the office by performing more than $350.00 worth of free services, and broke the rules of her licensure by seeing a new patient when the dentist was not in the office.

On May 24, 2012, defendant decided to file a complaint with the Board against plaintiff and Ms. Moulton with regard to the dental treatment given to Mr. Grendell. No complaint was filed against Ms. Huntington.

a. Complaint against Plaintiff

With regard to defendant's allegations against plaintiff, the Board's rules provide that a dental hygienist may perform certain duties, including cleaning and fluoride treatment on a patient of record when the dentist is not present. (Def.'s Exs. 15, 31, 32, 34, 36.) Defendant stated in her complaint, in part,

> I have recently been told by 3 of my employees that some stealing and practicing out of the scope of a dental hygiene license occurred in my office while I was away on vacation in June of 2011 . . . Normally I would not put in a formal complaint but I have spent a few good days thinking about the implications to my office and that my license could have been placed in jeopardy . . . Now I am sick to think that this was going on in my office when I was away . . . I am scared for the future of hygiene. I was a hygienist for 18 years in the Carolinas and have never seen such blatant disregard for ones license or ones job. I am reporting this as theft and working out of the scope of one's license and endangering the dentists license and the office of Bath Family Dental . . . So I had the privilege of paying her a wage for cheating, lying, and stealing and breaking the rules of her own licensure.

(Def.'s Ex. 15.)

30

The Board wrote to plaintiff and requested her response to the complaint. (Pl.'s Ex. 11.)

By letter to the Board dated June 27, 2012, plaintiff replied, in part,

> I did see Jeremy Grendell on June 22, 2011 . . . Having known Jeremy for the 3 years I worked for at that time, it never dawned on me to look at the computer to see under whose name the x-rays were taken . . . Now this allegation happened over a year ago. Why is it now just coming about as an issue . . . As a note, there is a Whistle Blowers Protection case ongoing. This Board complaint is just another form of harassment, retaliation and blacklisting by Tammy Cook for doing what I had the legal right to do and felt compelled to do. She is attacking my livelihood by filing this bogus complaint with the Board. I believe she has been auditing records of all patients I had seen in the 3½ years I worked for her, trying to find something to bring against me . . . Dr. Cook found out because she was intentionally trying to "dig up dirt" on me.

(Def.'s Ex. 16.)

Defendant responded by letter to the Board dated July 20, 2012 to plaintiff's response. Defendant emphasized her complaint focused on plaintiff's having knowingly exceeded the scope of her license. Defendant stated, in part:

> This complaint is before the Board not because Ms. Shafran violated office policies and engaged in theft of services, but because she knowingly exceeded the scope of her license. Ms. Shafran knew of our policy NOT to see new patients when I was not in the office. When summarizing our protocol, Ms. Shafran left out a crucial detail – the Doctor has to be in the office to do the oral examination and review the information the hygienist gathers. Then, if the patient is healthy she can continue on with the prophylaxis. It has never been the protocol that the patient is appointed back for the new patient exam. As is obvious, there was never any intention that this patient be seen by me. Why see the patient when I was on vacation? Why not properly schedule? Why delete records? Why not set up an electronic chart? Why not set up billing? Ms. Shafran knowingly examined a new patient thereby exceeding the scope of her hygienist's license.

(Def.'s Ex. 17.) Defendant included a statement from Ms. Dixon with the July 20, 2012 letter.

(Id.) A statement from Ms. Dixon was also filed with the May 24, 2012 complaint. (Id.)

31

By letter to the Board dated August 16, 2012, which included documents from the Department of Labor, plaintiff stated, in part,

> Also please find enclosed a copy from the U.S. Department of Labor, Office of the Solicitor, stating that because she violated, OSH 11c Whistleblowers Protection Act they are pursuing action against Tammy Cook. As I stated in my initial letter to you, I believe this Board complaint is retallatory [sic] in nature and Dr. Cook is trying anything and everything to damage my reputation and challenge my license, my livelihood.

(Def.'s Ex. 42.) By letter to the Board dated December 9, 2012, which included documents from the unemployment compensation litigation, plaintiff stated, in part,

> Please find enclosed a copy of the Maine unemployment decision, as well as a copy of the law suit Tammy Cook, DMD has filed against the Unemployment Commission . . . I hold to my conviction that this case is retallatory [sic] and vindictive, prompted by the OSHA complaint I had filed in October 2011. After the complaint was filed and subsequent OSHA Inspection, Dr. Cook went on a witch hunt, trying to dig up anything and everything to bring against me. I hope this information is helpful for you in trying to understand her hateful and vindictive nature.

(Def.'s Ex. 43.)

Ms. Huntington wrote a letter to the Board on plaintiff's behalf with regard to defendant's complaint. (Pl.'s Ex. 13.) A conference with the Board was scheduled for December 14, 2012 but was continued. (Def.'s Exs. 18, 19.) A second conference was scheduled for February 8, 2013 and a third for April 12, 2013. (Def.'s Exs. 21, 24.) As required by the February 2013 settlement agreement in the Department of Labor complaint, defendant informed the Board by letter dated February 1, 2013 that she would not be further involved and would not attend Board proceedings. (Def.'s Ex. 22; 23 4.)

By letter dated June 5, 2013, the Board informed plaintiff the Board had dismissed the complaint against her because it found no violation of the Dental Practice Act. (Def.'s Ex. 26.)

32

The Board did conclude plaintiff violated basic protocols about ensuring that patient care is recorded in a patient-identifiable record and that x-rays reviewed contain patient-identifying information. On the same date, the Board issued a letter of guidance, which will remain in plaintiff's file for five years. (Def.'s Ex. 26.)

### b. Complaint against Ms. Moulton

With regard to defendant's allegations against Ms. Moulton, the Board's rules provide that a dental assistant may take x-rays on a patient of record when the dentist is not present. (Def.'s Exs. 31, 33, 34, 35.) After defendant's complaint was filed, the Board scheduled a conference by letter dated May 29, 2013. (Def.'s Ex. 25.) Thereafter, on June 11, 2013, Ms. Moulton wrote a letter of explanation and apology to the Board. She stated, in part,

> In June 2011, Jeremy Grendell came into Dr. Cook's office. He was not on the schedule and was not a patient of Bath Family Dental. There was an opening in the schedule so I invited him to come by. He did not have insurance and his teeth are in bad shape. I took a full mouth series of x-rays on him and Dottie cleaned his teeth. These procedures were done without Dr. Cook's permission. I had a good working relationship with all my coworkers and no one seemed to mind or be bothered by Jeremy coming to the office. Jeremy's presence in the office was never discussed again. I was wrong to bring Jeremy into the office. I owe Dr. Cook a sincere apology and I'm willing to pay for the services we provided that day. I have wronged Dr. Cook and her practice and would like to take this opportunity to make it right . . . I respect Dr. Cook and am truly grateful for the opportunity she gave me . . . I understand the depth and weight my mistakes hold and I am prepared to deal with the consequences.

(Def.'s Ex. 27.)

In October 2014, Ms. Moulton reached a consent agreement regarding defendant's complaint to the Board. Ms. Moulton admitted she was wrong in treating Mr. Grendell. (Def.'s Ex. 29 ¶ 3.) The settlement agreement provided, in part,

33

> Ms. Moulton admits with regard to [defendant's] complaint she: engaged in the unauthorized practice of dental radiography on an individual who was not a patient of her supervising dentist and without knowledge or permission of her supervising dentist in violation of 32 M.R.S. §1100-K. Ms. Moulton admits that this conduct constitutes unprofessional conduct and grounds for discipline pursuant to 32 M.R.S. § 1100-Q91)(D).

(Def.'s Ex. 29 ¶ 12(a).)

### 3. Department of Labor Complaint

On September 7, 2012, the Department of Labor filed a complaint against defendant for alleged violation of the Act. 29 U.S.C. § 651 et seq. (Pl.'s Ex. 16.) The Secretary of Labor alleged defendant discharged plaintiff and constructively discharged Ms. Huntington from employment because of their exercise of their rights secured by the Act and, therefore, in violation of the Act. (Pl.'s Ex. 16 1, 4-5.)

### 4. Department of Labor and Defendant's Settlement Agreement

In February 2013, defendant entered a settlement agreement with the Department of Labor regarding the unemployment compensation litigation; the settlement agreement also addressed defendant's complaint to the Board regarding plaintiff. (Def.'s Ex. 23.) Pursuant to the terms of the agreement, defendant agreed to, among other things, the following: withdrawal of her appeal of the Commission's unemployment compensation decision (Def.'s Ex. 23 4); payment of $38,000 to plaintiff and $34,000 to Ms. Huntington as back wages (Def.'s Ex. 23 2-4); to refrain from providing to a potential future employer any damaging information about plaintiff or Ms. Huntington (Def.'s Ex. 23 5); and to inform the Board that defendant would not be involved in and would not attend any further Board proceedings concerning the complaint against plaintiff, absent certain circumstances. (Def.'s Ex. 23 4.)

34

Defendant did not admit any liability with regard to the Department of Labor's complaint. (Def.'s Ex. 23 2.) She did, however, accept responsibility for conduct and statements she regretted and continues to pay money to plaintiff and Ms. Huntington.

Other than the complaint to the Board, plaintiff agreed that she had not heard from any source that defendant said anything about plaintiff that would in any way damage her reputation, challenge her license, or impair her livelihood. (11/19/15 tr. 170-71.) Proceedings before the Board are confidential. 24 M.R.S. § 2510 (2016). There is no record on the Board's website that any complaint was filed against plaintiff.

### 5. Plaintiff's Maine Human Rights Commission Complaint

On March 18, 2013, approximately one month after the settlement agreement and while defendant's complaint against plaintiff to the Board was pending, plaintiff filed a Charge of Discrimination with the Maine Human Rights Commission against defendant and alleged retaliation. (Def.'s Ex. 41; see Def.'s Exs. 23, 25.) The Maine Human Rights Commission issued a Notice of Right to Sue dated February 4, 2014. (Pl.'s Ex. 18.)

### 6. Plaintiff's Superior Court Complaint

On May 1, 2014, plaintiff filed this six-count complaint against defendant in the Cumberland County Superior Court. Five counts remain pending.

### I. Plaintiff's Reaction[10]

Prior to the events of September and October 2011, plaintiff had been treated for depression for approximately fourteen years. She also had been taking medicine for anxiety and depression.

---

[10] Although no damages are awarded, this testimony affected the court's credibility assessment of plaintiff and Ms. Huntington.

35

Plaintiff has been a dental hygienist for 28 years and testified her "reputation is everything." (11/19/15 tr. 20.) She sought medical treatment between October 4 and 18, 2011 because she had an anxiety attack at work. She left work and called her doctor while driving. The doctor told her to pull over and not drive in that condition. The doctor calmed plaintiff and prescribed an antianxiety medicine.

When she was terminated, plaintiff felt humiliated and astounded. She had never received warnings of that nature and in that amount. She cried. She called her primary care physician after approximately one week because she was very depressed. The physician recommended counseling and increased the dosage of plaintiff's prescribed antidepressant, Cymbalta, and she continued the antianxiety medicine. The Cymbalta dosage was not reduced until approximately November or December 2014. Plaintiff treated with a counselor for fifteen weeks at $85.00 per session.

Plaintiff occasionally did not get out of bed. She left her house one or two times per week to attend counseling. She lost weight and her relationship with her husband suffered. She had a hard time becoming motivated to look for a job. When plaintiff received a letter from the Board regarding defendant's complaint, she was stunned and very upset. (Pl.'s Ex. 11.)

Plaintiff worked part time doing per diem temp work from January 2012 until June 2012. Her hours in January and February were sporadic. She returned to full time work in March 2012 and earned more than she had at Bath Family Dental. She received only a few weeks of unemployment compensation. As a result of defendant's settlement of the complaint filed by the Department of Labor, plaintiff will be paid back wages of $38,000.00 at a rate of $500.00 per month.

Ms. Huntington witnessed plaintiff having a panic attack and leaving work to see the doctor. Ms. Huntington had seen plaintiff cry and become emotional previously. From October 18, 2011 until June 2012, Ms. Huntington saw plaintiff every week. Ms. Huntington described plaintiff as distraught, really upset, discouraged, and depressed. Sometimes she was emotional and sobbing; sometimes she was a "blank zombie." (11/18/15 tr. 189.) She was also broke and had been denied unemployment but was unable to look for work. She was crushed because her name had been in the newspaper in the area where she grew up.

The unemployment case and the Board complaint added to her depression. According to Ms. Huntington, it was not until plaintiff began working for her current employer and was appreciated that any change occurred in plaintiff's demeanor.

CONCLUSIONS

### Count I: Violation of the Maine Human Rights Act (Whistleblower)

Plaintiff alleges defendant's response to plaintiff's claim for unemployment compensation and defendant's complaint to the Board violated the Maine Human Rights Act (MHRA). 5 M.R.S. §§ 4451-4634 (2016). Under the MHRA, unlawful employment discrimination includes an employer discriminating "with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment" because of a protected activity. 5 M.R.S. § 4572(1)(A) (2016); (see Def.'s Ex. 28.)

"A conditional privilege protects against liability for defamation when 'society has an interest in promoting free, but not absolutely unfettered, speech.'" Morgan v. Kooistra, 2008 ME 26, ¶ 32, 941 A.2d 447; see McCullough v. Visiting Nurse Serv., 1997 ME 55, ¶ 11, 691 A.2d 1201 ("a conditional privilege may arise in any situation in which an important interest of

37

the recipient of a defamatory statement will be advanced by frank communication"). Whether a privilege exists is "based on the totality of the circumstances, looking at the 'interests of the publisher and the recipient.'" Morgan, 2008 ME 26, ¶ 32, 941 A.2d 447. The court concludes defendant's response to plaintiff's application for unemployment compensation and defendant's complaint to the Board were conditionally privileged.

The issue is whether defendant abused the privilege because her response and complaint were made with malicious intent. McCullough, 1997 ME 55, ¶ 11, 691 A.2d 1201.

> Malice includes making a statement knowing it is false, with a reckless disregard for its truth, or acting out of spite or ill will. A reckless disregard for the truth exists only if the speaker had a "high degree of awareness of the probable falsity or serious doubt as to the truth of the statement."

Morgan, 2008 ME 26, ¶ 34, 941 A.2d 447; Rippett v. Bemis, 672 A.2d 82, 87 (Me. 1996); Onat v. Penobscot Bay Med. Ctr., 574 A.2d 872, 874 (Me. 1990).

The court concludes, based in particular on the credible testimony of Ms. Michaud and Ms. Dixon, who have no particular personal interest in the outcome of this trial, that Bath Family Dental was not an enjoyable place to work during 2011. Defendant experienced significant personal, professional, and financial stress during 2011. She entered a settlement agreement with regard to her conduct during that time period. (Def.'s Ex. 23.)

Not all responsibility for the work environment at Bath Family Dental during 2011 can be attributed to defendant's volatile personality, however. She also faced conflict from within the practice and a desire by plaintiff to control in some way that environment. In spite of her own inconsistent statements and the credible testimony to the contrary from other witnesses, plaintiff maintained throughout trial that her professionalism was beyond reproach. This record,

including her own statements to the Board about defendant and the treatment of Mr. Grendell, does not support that assertion. (Compare Def.'s Ex. 15 with Def.'s Exs. 16, 42, 43.)

Ms. Huntington agreed that only three instances of concern were raised directly with defendant before Ms. Huntington and plaintiff determined to report defendant to OSHA anonymously. Of Ms. Huntington's six complaints to OSHA, only one was substantiated and that was listed as an "other" violation. Based on this record and the testimony of Dr. Turbyne, defendant acted appropriately when the complaints were made. Defendant did not act as specifically requested by plaintiff and Ms. Huntington with regard to Ms. Michaud. Defendant has now "paid the price," as she testified, for her reaction to the complaints and resulting inspection, but the motivation for the complaints, on this record, is questionable.

Defendant testified that plaintiff's negative remarks about Bath Family Dental in front of patients and a sales representative was the "last straw." Ms. Dixon confirmed plaintiff's conversation. The Unemployment Insurance Commission found plaintiff participated in an "inadvisable" conversation with a representative in the waiting room. Although the February 2013 settlement agreement resolved the issue of plaintiff's termination for the purposes of unemployment compensation, defendant did not admit the allegations in the Department of Labor complaint.

Defendant's statements to the Board are, however, the true focus of plaintiff's complaint. Defendant attended years of education and incurred significant debt to become a dentist and open and operate successfully Bath Family Dental. She provided employment for several people, helped them financially, offered benefits and continuing education, and sent them to school. She testified that she was shocked and devastated when she learned that a drug addict and convicted criminal, who had stolen a prescription pad from another dentist and written prescriptions, had

39

been treated in her practice during her absence, in violation of several provisions of office protocol and in violation of her previous refusal to treat him. She was concerned about patient safety and potential damage to the practice and her dental license. That testimony is credible and her reaction to the fact that her employees surreptitiously engaged in this conduct was justified.

Plaintiff's testimony that she assumed Mr. Grendell was a patient of record, she assumed his information would be entered in the computer, in spite of the fact Ms. Moulton, his girlfriend, was writing the information on paper, and her statement it never "dawned" on her to look for a name on the x-rays was not credible. Plaintiff's use of a paper chart, her failure to look for a name on the x-rays, and the fact that Mr. Grendell's treatment was never discussed with defendant upon her return violated longstanding standard protocols at Bath Family Dentist. Mr. Grendell paid nothing for his treatment performed by Bath Family Dental employees who were being paid for their services.

The terms of the settlement agreement precluded defendant's participation at the conference with regard to defendant's complaint to the Board. Accordingly, the Board decided the matter without hearing from one of the parties. The Board found Ms. Moulton engaged in the unauthorized practice of her license based on her treatment of Mr. Grendell. The Board found no violation of plaintiff's license based on her treatment of Mr. Grendell. There appear to have been no culpable state of mind requirements in the applicable statutes. See 32 M.R.S. §§ 1100-Q(1)(D) (2015), repealed by P.L. 2015, ch. 429 § 17 (effective July 29, 2016) ("Unprofessional conduct. In this context, unprofessional conduct means the violation of a standard of professional behavior that through professional experience has been established in the practice of dental radiography."); 1077(2)(F) (2015), repealed by P.L. 2015, ch. 429 § 17 (effective July 29, 2016) ("Unprofessional conduct. A licensee is considered to have engaged in

unprofessional conduct if the licensee violates a standard of professional behavior that has been established in the practice for which the licensee is licensed."). The Board did issue a letter of guidance based on plaintiff's violation of basic hygienist protocols.

Accordingly, there is support in this record for defendant's challenge to plaintiff's receipt of unemployment compensation based on a termination for misconduct. Further, this record supports defendant's complaint to the Board. The court does not conclude that defendant acted with malice in her challenge to plaintiff's unemployment compensation or defendant's complaint about plaintiff to the Board. As discussed,

> Malice includes making a statement knowing it is false, with a reckless disregard for its truth, or acting out of spite or ill will. A reckless disregard for the truth exists only if the speaker had a "high degree of awareness of the probable falsity or serious doubt as to the truth of the statement."

Morgan, 2008 ME 26, ¶ 34, 941 A.2d 447.

### Count III: Intentional Infliction of Emotional Distress

In order to prevail on this claim, plaintiff must prove the following:

(1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from [defendant's] conduct;
(2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized society;
(3) the actions of the defendant caused the plaintiff's emotional distress; and
(4) the emotional distress suffered by the plaintiff was so severe that no reasonable [person] could be expected to endure it.

Curtis v. Porter, 2001 ME 158, ¶ 10, 784 A.2d 18 (internal quotation marks omitted). Defendant's conduct was not "so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized society." Id.; see

41

Bratton v. McDonough, 2014 ME 64, ¶ 22, 91 A.3d 1050; Champagne v. Mid-Maine Med. Ctr., 1998 ME 87, ¶ 16, 711 A.2d 842.

### Count IV: Negligent Infliction of Emotional Distress

Plaintiff does not allege a separate negligent infliction of emotional distress claim. See Jacobi v. MMG Ins. Co., 2011 ME 56, ¶ 17, 17 A.3d 1229. The claim must be based on a separate underlying tort that allows recovery for "mental anguish and loss of enjoyment of life" or the claim may be subsumed in the claim for intentional infliction of emotional distress. Curtis, 2001 ME 158, ¶¶ 19-22, 784 A.2d 18; Kopenga v. Davric Maine Corp., 1999 ME 65, ¶ 18, 727 A.2d 906. As discussed above, the court determines the conditional privilege was not abused and, therefore, there is no separate tort on which to base this claim.

### Count V: Defamation

The elements of defamation include: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the publisher; (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. Rippett, 672 A.2d at 86. As discussed above, the court determines the conditional privilege was not abused. See Cole v. Chandler, 2000 ME 104, ¶ 19, 752 A.2d 1189.

### Count VI: Slander Per Se

"Slander per se refers to spoken defamatory statements that 'relate to a profession, occupation or official station in which the plaintiff was employed. Malice is implied as a matter of law in such cases, and the claimant may recover compensatory damages without proving special damages.'" Cookson v. Brewer School Dep't, 2009 ME 57, ¶ 27, 974 A.2d 276. As

42

discussed above, the court determines the conditional privilege was not abused. See Saunders v. Van Pelt, 494 A.2d 1121, 1124-25 (Me. 1985).

The entry is

> Judgment is entered in favor of Defendant, Tammy Cook, d/b/a Bath Family Dental and against Plaintiff Dorothy Shafran on Counts I, III, IV, V, and VI of Plaintiff's Complaint.

Date: March 13, 2017

Nancy Mills
Justice, Superior Court

43

## PORSC-CV-2014-00213 | DOROTHY SHAFRAN VS TAMMY COOK DBA BATH FAMILY DENTAL

  

Search  Open Financials  Print Docket  Reports/Forms

Filter attorneys for party:  - All Parties -

| Attorney | Party | Representation Type | Representation Date |
|---|---|---|---|
| Sullivan, Eugene | Dorothy Shafran - 1 Pla... | Retained | 11/16/2015 |
| Kline, Robert | Tammy Cook - 2 Defen... | Retained | 07/25/2014 |
| Mehnert, Cynthia | Dorothy Shafran - 1 Pla... | Retained | 05/01/2014 |
| Mehnert, Eric | Dorothy Shafran - 1 Pla... | Retained | 05/01/2014 |

STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-14-213
NM-CUM-11-26-14

DOROTHY SHAFRAN,

   Plaintiff

v.

TAMMY COOK d/b/a
BATH FAMILY DENTAL,

   Defendant

ORDER ON DEFENDANT'S
MOTION TO DISMISS AND
MOTION TO STRIKE

Before the court are defendant's motion to dismiss plaintiff's complaint in its entirety and defendant's motion to strike exhibits included with plaintiff's response to defendant's motion to dismiss. M.R. Civ. P. 12(b)(6) & 12(f).

In her complaint, plaintiff alleges that during her employment at defendant's dental office, she complained to OSHA concerning certain health practices in defendant's office. (Compl. ¶ 7.) She alleges that after the complaint, Dr. Cook issued unfounded and retaliatory disciplinary warnings against plaintiff and discharged her from employment. (Compl. ¶¶12, 13.) Plaintiff alleges further that Dr. Cook interfered in plaintiff's effort to obtain unemployment compensation and filed a complaint against plaintiff with the Maine Board of Dental Examiners. (Compl. ¶¶16, 18.) Plaintiff filed a complaint with the Maine Human Rights Commission and was issued a right to sue letter on February 4, 2014. (Compl. ¶¶ 21, 23, 25.)

On May 1, 2014, plaintiff filed this lawsuit. She alleges the following: count I: Violation of the Maine Whistleblower's Protection Act; count II: False Light; count III: Intentional Infliction of Emotional Distress; count IV: Negligent Infliction of Emotional Distress; count V: Defamation; count VI: Slander Per Se. In lieu of an answer, defendant filed the pending motion to dismiss on July 25, 2014 and attached two exhibits to the motion. Plaintiff attached five exhibits to her response to the motion. With the reply to plaintiff's opposition, defendant filed a motion to strike plaintiff's exhibits.

For the following reasons, the motion to dismiss is granted in part and denied in part. The motion to strike is granted.

## FACTS

The following facts are taken from plaintiff's complaint. Defendant Tammy Cook is a dentist whose business, Bath Family Dental, is located in Bath, Maine. (Compl. ¶ 2.) Plaintiff Dorothy Shafran worked as a hygienist for defendant from July 2008 to October 18, 2011. (Compl. ¶ 3.)

In late 2010, plaintiff became concerned about infection control lapses in defendant's office. (Compl. ¶¶ 4-5.) After discussing her concerns with defendant to no avail, plaintiff filed a complaint with OSHA alleging a number of health and safety hazards at the Bath Family Dental office. (Compl. ¶¶ 6-7.) In response to plaintiff's complaint, OSHA inspectors conducted an inspection of defendant's office on October 4, 2011. (Compl. ¶ 8.)

During the OSHA inspection, defendant told the OSHA inspectors that she knew who filed the complaint and would fire those individuals. (Compl. ¶ 9.) The OSHA inspectors advised defendant that firing an employee for making an OSHA complaint would violate OSHA's whistleblower protections. (Compl.

2

10.) Defendant responded that she would fire the responsible individuals for another reason and no one would be able to prove it was connected to the OSHA complaint. (Compl. ¶ 10.) After the inspectors left, defendant immediately made statements that she suspected plaintiff was involved in filing the OSHA complaint. (Compl. ¶ 11.)

During the next two weeks, defendant began issuing to plaintiff unfounded and retaliatory disciplinary warnings. (Compl. ¶ 12.) These warnings culminated in plaintiff's termination on October 18, 2011. (Compl. ¶ 13.) As a result of defendant's retaliatory actions, the U.S. Department of Labor filed a complaint against defendant. (Compl. ¶ 14.) Defendant entered a consent agreement with the Department of Labor on February 4, 2013. (Compl. ¶ 15.)

After plaintiff was fired, she sought unemployment compensation. (Compl. ¶ 16.) Defendant challenged plaintiff's right to unemployment compensation and stated plaintiff had been discharged for misconduct. (Compl. ¶ 16.) After a lengthy appeal process, the Unemployment Insurance Commission found that plaintiff had not engaged in misconduct that warranted discharge. (Compl. ¶ 17.)

On May 23, 2012, defendant filed a complaint against plaintiff with the Maine Board of Dental Examiners (the Board). (Compl. ¶ 18.) In her complaint, defendant alleged that plaintiff had engaged in "theft and working out of the scope of one's license and endangering the dentist's license." (Compl. ¶ 18.) Defendant concluded in her complaint, "So I had the privilege of paying [plaintiff] a wage for cheating, lying, stealing, and breaking the rules of her own licensure." (Compl. ¶ 19.) On June 5, 2012, the Board voted to dismiss the complaint and found "no violation of the Dental Practice Act." (Compl. ¶ 20.)

3

## DISCUSSION

### A. MOTION TO STRIKE

Defendant filed a motion to strike the exhibits attached to plaintiff's response to the motion to dismiss. M.R. Civ. P. 12(f). In fact, both parties attached exhibits to their pleadings. "The general rule is that only the facts alleged in the complaint may be considered on a motion to dismiss . . . ." See Moody v. State Liquor & Lottery Comm'n, 2004 ME 20, ¶ 8, 843 A.2d 43. Although there are exceptions to the general rule, the majority of the parties' exhibits do not come within the exceptions, are incomplete, and inadmissible. Id. ¶ 10. Further, such additional evidence is better considered on a motion for summary judgment, when the court has the benefit of the organizing principles of Rule 56. The court has not considered these exhibits in deciding this motion to dismiss.

### B. MOTION TO DISMISS

#### 1. Standard of Review

On review of a motion to dismiss for failure to state a claim, the court accepts the facts alleged in plaintiff's complaint as admitted. Saunders v. Tisher, 2006 ME 94, ¶ 8, 902 A.2d 830. The court then examines those facts "in the light most favorable to plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." Doe v. Graham, 2009 ME 88, ¶ 2, 977 A.2d 391 (quoting Saunders, 2006 ME 94, ¶ 8, 902 A.2d 830). "For a court to properly dismiss a claim for failure to state a cause of action, it must appear 'beyond doubt that [the] plaintiff is entitled to no relief under any set of facts that might be proven in support of

the claim.'" Dragomir v. Spring Harbor Hosp., 2009 ME 51, ¶ 15, 970 A.2d 310

(quoting Plimpton v. Gerrard, 668 A.2d 882, 885 (Me. 1995)).

2. Whistleblower Protection Act Claim (Count I); Defamation (Count V), and Slander Per Se (Count VI)

a. Conditional Privilege or Absolute Privilege

Defendant first argues that the basis for plaintiff's complaint, defendant's letter to the Board, is a privileged communication and defendant cannot be liable for her statements in that letter. Plaintiff argues that while the communication may be conditionally privileged, the defendant has either abused that privilege or acted outside the scope of her reporting obligations.

The first issue is the extent of the reporting privilege under the Maine Health Security Act. The provision granting immunity under certain circumstances, 24 M.R.S. § 2511 (2013), provides:

> Any person acting without malice, any physician, podiatrist, health care provider, health care entity or professional society, any member of a professional competence committee or professional review committee, any board or appropriate authority and any entity required to report under this chapter are immune from civil liability:
>
> 1. **Reporting.** For making any report or other information available to any board, appropriate authority, professional competence committee or professional review committee pursuant to law;
>
>  . . . .

Interpretation of this section requires a determination of whether the phrase "acting without malice" applies to physicians and health care providers. In Benjamin v. Aroostook Medical Center, the federal district court of Maine appeared to apply the "acting without malice" standard to any report, regardless of who made it. 937 F. Supp. 957, 975 (D. Me. 1996). The Law Court has applied this section, but found it unnecessary "to express an opinion whether the

5

immunity provided by section 2511 is absolute or conditioned on the reporter acting without malice . . . ." McCullough v. Visiting Nurse Serv. of S. Me., Inc., 1997 ME 55, ¶ 14, 691 A.2d 1201.

Under a plain language interpretation, "acting without malice" must apply only to "any person" and not to physicians and the other entities explicitly listed in this section. This interpretation of the statute is explicitly set forth in the legislative history of an amendment to this section, which explains the old law and how the section was amended:

> Under existing law, immunity from civil and criminal liability is accorded in certain circumstances to any person, physician, health care provider, physicians' professional society, physicians' professional competence committee member or member of the medical or osteopathic board or related health care authority. The immunity applies if an individual or organization in the list above acts without malice in reporting information to an appropriate health care board or authority, in assisting in preparing information to be so reported, or in assisting the board or authority to carry out its duties with regard to the health care profession.
>
> Section 5 makes 3 substantive changes in the existing law.
> . . .
> Third, section 5 accords physicians and the listed health care organizations immunity for reporting to and assisting a pertinent health care board, authority or committee without regard to whether the actions were with malice. This blanket immunity is not accorded to other persons reporting to or assisting the health care boards, authorities or committees; the 'malice' standard remains for these persons.
> . . .
> [B]lanket civil immunity, as opposed to immunity applying a 'malice' standard, is accorded physicians and the listed health care organizations because they, as opposed to other persons, have certain duties to report imposed by the Maine Health Security Act.

L.D. 2520, Statement of Fact, § 5, at 11-12 (113th Leg. 1988). If defendant's letter to the Board is a report by a physician or one of the listed health care organizations that has a duty to report, defendant is absolutely immune from civil liability for any statements in-that report.

6

Defendant, a dentist, is not a "physician" as defined by the MHSA. The Act defines physician as "any natural person authorized by law to practice medicine, osteopathic medicine or veterinary medicine within this State." 24 M.R.S. § 2502(3). The Act defines health care practitioner as "physicians and all others certified, registered or licensed in the healing arts, including, but not limited to, nurses, podiatrists, . . . dentists . . . ." Id. § 2502(1-A). If the term "physician" included dentists, the inclusion of dentists as a separate group in the definition of health care practitioner would not be required.[1]

Defendant's letter could be a report by a health care provider as defined under the MHSA. Health care provider is defined as "any hospital, clinic, nursing home or other facility in which skilled nursing care or medical services are prescribed by or performed under the general direction of persons licensed to practice medicine, dentistry, podiatry or surgery in this State and that is licensed or otherwise authorized by the laws of this State." 24 M.R.S. § 2502(2). Under this definition, defendant's dental office is a health care provider. There may be a factual issue as to whether the letter was written on behalf of the dental office as an entity or whether it was a personal letter from the defendant.

Assuming that the letter is from a health care provider, the next question is whether the report was made "pursuant to law."[2] Defendant argues that the

---

1 The definition of health care provider in the Act also supports the conclusion that a dentist is not a physician. That definition includes persons "licensed to practice medicine, dentistry, podiatry, or surgery . . . ." 24 M.R.S. § 2502(2). The definition of "physician" applies only to individuals "licensed to practice medicine." Id. § 2502(3). If practicing dentistry is the "practice of medicine," the legislature would not have listed dentistry as a separate practice.

2 Arguably, section 2511 could be read to provide blanket immunity to health care provider reports, regardless of whether they were made pursuant to a statutory duty to report. Given the plain language of the statute, however, which states "any entity required to report" and the legislature's rationale for granting these entities blanket

7

report was either required or authorized pursuant to two sections of the MHSA. First, defendant argues that 24 M.R.S. § 2506 required the report. That section states:

> A health care provider or health care entity shall, within 60 days, report in writing to the disciplined practitioner's board or authority the name of any licensed, certified or registered employee or person privileged by the provider or entity whose employment, including employment through a 3rd party, or privileges have been revoked, suspended, limited or terminated or who resigned while under investigation or to avoid investigation for reasons related to clinical competence or unprofessional conduct, together with pertinent information relating to that action.

Under this section, the report "shall be made within 60 days" of either termination or another event adverse to the health care practitioner. The statute requires a report only when the actions described in the report led to the termination or other adverse action. See McCullough, 1997 ME 55, ¶¶ 12-14, 691 A.2d 1201 (finding two letters privileged where the letters contained information about the basis for the termination and the specific details about the incidents leading to termination). In this case, according to the complaint, the report was not made within 60 days[3] and the report did not concern actions that led to plaintiff's termination. (Compl. ¶¶ 18-19.) Defendant was, therefore, not obligated to file a report under this section.

Defendant also relies on 24 M.R.S. § 2505, which states:

> Any professional competence committee within this State and any physician or physician assistant licensed to practice or otherwise lawfully practicing within this State shall, and any other person may, report the relevant facts to the appropriate board relating to

---

immunity, the better interpretation is to apply blanket immunity only to those reports that are required by law. 24 M.R.S. § 2511; see also McCullough, 1997 ME 55, ¶ 14, 691 A.2d 1201 (health care provider "fulfill[ed] its obligation to report [plaintiff's] termination to the board").

3 Defendant relies on facts that do not appear in the complaint when addressing the 60-day requirement. (Def.'s Mem. 4-5.)

the acts of any physician or physician assistant in this State if, in the opinion of the committee, physician, physician assistant or other person, the committee or individual has reasonable knowledge of acts of the physician or physician assistant amounting to gross or repeated medical malpractice, . . . professional incompetence, unprofessional conduct or sexual misconduct identified by board rule.

This section cannot apply to defendant's letter because the section applies only to reports relating to the acts "of any physician or physician assistant." Plaintiff is neither a physician nor a physician assistant.[4]

Because defendant was not obligated to make a report under the MHSA, defendant does not receive absolute immunity for her letter. It is not clear that section 2511 applies to defendant's report if that report was not authorized "pursuant to" the MHSA. 24 M.R.S. § 2511(1). Nevertheless, the communication could be conditionally privileged under the common law. See Morgan v. Kooistra, 2008 ME 26, ¶ 32, 941 A.2d 447 ("A conditional privilege protects against liability for defamation when society has an interest in promoting free, but not absolutely unfettered, speech." (internal quotation marks omitted)). As explained below, because the motion to dismiss should be denied even if the communication is conditionally privileged, the court does not decide at this point whether a privilege applies.

### b. Applying the Malice Standard

Assuming that the malice standard applies to defendant's report, plaintiff has alleged facts that could support a finding of malice. "Malice includes making a statement knowing it is false, with a reckless disregard for its truth, or acting

---

4 As explained above, because defendant herself is not a physician or physician assistant, defendant could make the report only under the clause relating to "any person." Authorized reports from "any person" would not receive blanket immunity. See 24 M.R.S. § 2511 ("Any person acting without malice . . . .").

out of spite or ill will." Id. ¶ 34. Plaintiff's complaint alleges that defendant made statements to an OSHA inspector that she was going to fire plaintiff for filing an OSHA complaint. (Compl. ¶ 10.) Plaintiff further alleges that she was issued unfounded disciplinary warnings that led to her termination within two weeks of the OSHA inspection. (Compl. ¶¶ 12-13.) Defendant then opposed plaintiff's ability to receive unemployment benefits. (Compl. ¶ 16.) Plaintiff quoted statements from defendant's letter to the Board, which could demonstrate defendant's acrimony towards plaintiff. (Compl. ¶¶ 18-19.) These alleged facts are sufficient to support a finding that defendant acted with malice in making the report to the Board.

Because defendant is not immune from civil liability, counts I, V, and VI of the complaint will not be dismissed.

### 3. False Light (Count II)

Defendant argues plaintiff's complaint fails to state a cause of action for false light because there is no allegation of publicity, an element of the tort. Maine follows the Restatement's formulation of the tort of false light invasion of privacy, which states:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Cole v. Chandler, 2000 ME 104, ¶ 17, 752 A.2d 1189 (quoting Restatement (Second) of Torts § 652E (1977)). "Publicity" is defined by the Restatement as:

> "Publicity," as it is used in this Section, differs from "publication," as that term is used in § 577 in connection with liability for defamation. "Publication," in that sense, is a word of art, which

10

includes any communication by the defendant to a third person. "Publicity," on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.

Id. (quoting Restatement (Second) of Torts § 652D cmt. a (1977)).

In a recent federal case, the court applied Maine law and dismissed a false light claim where the only allegations in the complaint were that the defendant "inform[ed] the Plaintiff's prospective employers and/or medical staffing agencies that the Plaintiff had been dismissed from the Hospital for unsatisfactory performance." Murtagh v. St. Mary's Reg'l Health Ctr., 2013 WL 5348607, at *9 (D. Me. 2013). The court concluded that these allegations were insufficient to satisfy the publicity requirement. Id.

Plaintiff's complaint alleges only that defendant's statements and written complaint to the Board form the basis of her false light claim.[5] The complaint fails to allege publicity. Accordingly, count II of plaintiff's complaint is dismissed.

4. Intentional Infliction of Emotional Distress (Count III)

Defendant argues that she is entitled to judgment on count III because the alleged conduct of filing the report is not extreme and outrageous as a matter of law. A plaintiff must demonstrate the following elements to prevail on an intentional infliction of emotional distress claim:

(1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from [defendant's] conduct;

---

5 The Board is generally required to keep complaints confidential. 24 M.R.S. § 2510.

11

(2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community;

(3) the actions of the defendant caused the plaintiff's emotional distress; and

(4) the emotional distress suffered by the plaintiff was so severe that no reasonable [person] could be expected to endure it.

Curtis v. Porter, 2001 ME 158, ¶ 10, 784 A.2d 18 (internal quotations marks omitted). "[I]t is for the court to determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery." Lougee Conservancy v. CitiMortgage, Inc., 2012 ME 103, ¶ 26, 48 A.3d 774 (internal quotation marks omitted). Defendant relies on cases in which the courts held that a plaintiff could not recover as a matter of law because the alleged conduct did not meet the "extreme and outrageous" standard. See Botka v. S.C. Noyes & Co., Inc., 2003 ME 128, ¶ 19, 834 A.2d 947; Staples v. Bangor Hydro-Electric Co., 561 A.2d 499, 501 (Me. 1989); Osgood v. C.U. York Ins. Co., 2006 WL 1980396, at *7 (Me. Super. June 5, 2006).

As plaintiff points out, however, all of these cases were decided on summary judgment. Plaintiff has alleged that defendant engaged in a campaign to destroy her professional reputation, which included baseless disciplinary warnings and a defamatory letter to the Board. (Compl ¶¶ 12, 13, 18, 19, 27, 32, 36.) Because the specific facts may be important regarding whether the defendant's conduct was extreme and outrageous, the court denies the motion to dismiss the intentional infliction of emotional distress claim. Bratton v. McDonough, 2014 ME 64, ¶ 23, 91 A.3d 1050 (explaining that if reasonable people may differ as to whether conduct is "extreme and outrageous," a

12

defendant is not entitled to judgment as a matter of law). Count V of the complaint will not be dismissed.

### 5. Negligent Infliction of Emotional Distress (Count IV)

Defendant argues that plaintiff's negligent infliction of emotional distress claim fails as a matter of law. A separate negligent infliction claim is limited to situations involving bystander liability, a special relationship between the tortfeasor and the plaintiff, or a separate, independent tort that is the cause of the emotional distress. Jacobi v. MMG Ins. Co., 2011 ME 56, ¶ 17, 17 A.3d 1229. There are no allegations in the complaint regarding bystander liability or a special relationship between the parties. Thus, if plaintiff can recover for negligent infliction of emotional distress, the claim must be based on a separate underlying tort.

Plaintiff has alleged defamation and slander per se. A defamation claim could constitute the underlying tort for the purposes of plaintiff's negligent infliction of emotional distress claim. See Packard v. Cent. Me. Power Co., 477 A.2d 264, 269 (Me. 1984) (affirming trial court's decision granting defendant judgment notwithstanding the verdict on plaintiff's negligent infliction of emotional distress claim where the jury found for defendant on the underlying defamation claim). Although as alleged, negligent infliction of emotional distress is not an independent claim in this case, plaintiff could recover under this theory if she prevails on her defamation claim. Count IV of the complaint will not be dismissed.

13

The entry is

Defendant's Motion to Strike is GRANTED.

Defendant's Motion to Dismiss is GRANTED as follows: Count II of Plaintiff's Complaint is DISMISSED. Defendant's Motion to Dismiss is DENIED on Counts I, III, IV, V, and VI.

Date: 11·26·14

Nancy Mills
Justice, Superior Court

CUMBERLAND-CV-14-213

14

CLERK OF COURTS
Cumberland County
205 Newbury Street, Ground Floor
Portland, ME 04101

CYNTHIA MEHNERT ESQ     *Plaintiff's Attorney*
HAWKES & MEHNERT
PO BOX 458
ORONO ME 04473

CLERK OF COURTS
Cumberland County
205 Newbury Street, Ground Floor
Portland, ME 04101

ROBERT KLINE ESQ     *Defendant's Attorney*
KLINE LAW OFFICES LLC
PO BOX 7859
PORTLAND ME 04112-7859